IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Larissa A. Smith, | ) | C/A No.: 1:14-4400-RBH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

A.    Procedural History

On February 17, 2011, Plaintiff protectively filed an application for SSI in which she alleged her disability began on February 1, 2005. Tr. at 151. Her application was denied initially and upon reconsideration. Tr. at 86–89, 95–96. On April 9, 2013,

Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ronald Sweeda.  Tr. at 34–56 (Hr'g Tr.).  The ALJ issued an unfavorable decision on June 13, 2013, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 15–32.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on November 13, 2014.  [ECF No. 1].

    B.    Plaintiff's Background and Medical History

        1.    Background

Plaintiff was 38 years old at the time of the hearing.  Tr. at 38.  She completed high school.  *Id.*  Her past relevant work ("PRW") was as a cashier and a housekeeper. Tr. at 53.  She alleges she has been unable to work since February 1, 2005.[1]  Tr. at 79, 151.

        2.    Medical History

On February 11, 2010, Plaintiff presented to Mitch Twining, M.D. ("Dr. Twining"), regarding degenerative disc disease and fibromyalgia. Tr. at 529. Plaintiff complained of pain all over, but particularly in her low back and sometimes radiating down her left leg. *Id.* Dr. Twining observed Plaintiff to have 16 of 18 fibromyalgia tender

---

[1] Although Plaintiff alleges her disability began on February 1, 2005, she did not file the pertinent application for SSI until February 17, 2011. Tr. at 79, 151. An individual is not eligible for SSI for any period prior to the date on which the application was filed. *See* 20 C.F.R. § 416.305(a). The undersigned also notes that Plaintiff filed earlier applications for benefits that were denied by ALJs on November 11, 2008, and October 7, 2010. *See* Tr. at 57–76, 160. Therefore, the relevant period for the court's consideration is February 17, 2011, through the date of the ALJ's decision.

points and a positive straight-leg raise on the left. Tr. at 530. Plaintiff reported pain with range of motion ("ROM") of her left knee. Dr. Twining indicated he had referred Plaintiff for pain management and epidural steroid injections, but that the providers would not accept her insurance. Tr. at 532. He prescribed Neurontin 800 mg, three times daily. *Id.*

Plaintiff followed up with Dr. Twining on April 8, 2010. Tr. at 533. She complained of back pain, but indicated her mood had improved since she resumed mental health treatment. *Id.* Dr. Twining observed Plaintiff to have 16 of 18 positive trigger points for fibromyalgia and painful ROM of her left knee. Tr. at 535.

On May 6, 2010, Plaintiff reported increased pain, weakness, swelling, difficulty sleeping, cough, and mucous production. Tr. at 537. Dr. Twining observed Plaintiff to have fullness over her metacarpophalangeal ("MCP") joints, 16 of 18 positive trigger points for fibromyalgia, and left knee pain with ROM. Tr. at 539. He diagnosed bronchitis; prescribed Prednisone, Azithromycin, and Percocet; and instructed Plaintiff to return for follow up in two months. Tr. at 540.

Plaintiff presented to Agnes Devenyi, M.D. ("Dr. Devenyi"), on May 20, 2010, and was upset because welfare paperwork she had dropped off to be completed by Dr. Devenyi had been lost. Tr. at 340. Plaintiff indicated she remained unable to maintain gainful employment because of fibromyalgia, panic attacks, and anxiety. *Id.* Dr. Devenyi assessed a global assessment of functioning ("GAF")[2] score of 65. Tr. at 341.

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF

On June 10, 2010, Plaintiff complained to Dr. Twining that her cough had not resolved with medication. Tr. at 541. She reported chills, aches, pain, and swelling. *Id.* Dr. Twining observed Plaintiff to have 16 of 18 positive trigger points for fibromyalgia and left knee pain with ROM. Tr. at 543. Dr. Twining prescribed Cipro and Robitussin for bronchitis and refilled Plaintiff's prescriptions for Neurontin and Percocet. Tr. at 544–45.

Plaintiff was admitted to Conway Medical Center on June 20, 2010, with atypical chest pain, narcotic dependence, possible sarcoidosis, dyspnea, dysphagia, and hyperglycemia. Tr. at 510. She was discharged the next day with instructions to follow up with Hafez M. Hayek, M.D. ("Dr. Hayek"), regarding an abnormal chest computed tomography ("CT") scan. *Id.* Daniel J. Gordon, M.D., indicated Plaintiff's complaints of chest pain were atypical and that he suspected that "to a large extent" Plaintiff was engaging in "drug-seeking behavior." *Id.*

Plaintiff presented to Dr. Devenyi for psychiatric follow up on July 6, 2010. Tr. at 338. She reported being stable and doing well. *Id.* Dr. Devenyi assessed her to have a GAF score of 65. Tr. at 339.

Plaintiff also presented to Dr. Hayek on July 6, 2010. Tr. at 450. She reported a productive cough, chest pressure, and a three-month history of shortness of breath after walking half a block. *Id.* She noted symptoms that included weight gain, fatigue, skin dryness, itching, and rash; blurred vision; sore throat; dyspnea and wheezing; swelling of

scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

extremities; abdominal pain, change in bowel habits, and nausea and vomiting; pain in her back, joints, and muscles; stiffness and swelling in her joints; muscle weakness; numbness; dizziness; headaches; anxiety; depression; insomnia; excessive thirst; and enlarged lymph nodes. Tr. at 451. Dr. Hayek referred Plaintiff for pulmonary function testing and to a cardiothoracic surgeon for follow up. Tr. at 452.

On July 16, 2010, Plaintiff presented to Dr. Twining for follow up. Tr. at 546. Dr. Twining noted that Plaintiff's insurance would no longer cover Percocet 7.5 mg. *Id.* He indicated he would change her dosage from three Percocet 7.5 mg tablets daily to five Percocet 5 mg tablets daily. *Id.* Dr. Twining observed Plaintiff to have 16 of 18 positive trigger points for fibromyalgia, lesions behind her left ear, and left knee pain with ROM. Tr. at 548.

Plaintiff was admitted to Grand Strand Regional Medical Center from August 12 to 16, 2010, for mediastinoscopy and Chamberlain procedure to treat mediastinal lymphadenopathy. Tr. at 242. A right paratracheal lymph node excision showed extensive noncaseating epithelioid granulomas; a periaortic lymph node excision showed extensive effacement with noncaseating epithelioid granulomas; and a left hilar lymph node excision showed extensive nodal fibrosis with epithelioid granulomas. *Id.* Plaintiff's discharge instructions indicated she should avoid heavy lifting, pushing, or pulling over seven to 10 pounds, strenuous upper body activity for 12 weeks, and driving for one month. Tr. at 243.

Plaintiff followed up with Dr. Hayek on August 31, 2010, to discuss the results of the procedure. Tr. at 462. Dr. Hayek indicated Plaintiff's biopsy was consistent with a

diagnosis of sarcoidosis. *Id.* Plaintiff reported some soreness at her surgical site, but stated she was otherwise doing well. *Id.* She complained of mild shortness of breath when walking more than two blocks. *Id.* Dr. Hayek indicated that use of systemic steroids was not necessary because Plaintiff was not very symptomatic Tr. at 464.

On September 7, 2010, Plaintiff discussed with Dr. Devenyi a desire to quit smoking. Tr. at 336. Dr. Devenyi indicated she would increase Plaintiff's dosage of Wellbutrin to help with depressive symptoms and smoking cessation. *Id.* Plaintiff stated she sometimes heard her name called. *Id.* Dr. Devenyi assured Plaintiff that she was not experiencing hallucinations. *Id.* She assessed Plaintiff's GAF score to be 65. Tr. at 337.

Plaintiff followed up with A. Brian McIntyre, M.D. ("Dr. McIntyre"), regarding her biopsy results on September 8, 2010. Tr. at 248. Dr. McIntyre indicated the pathology was consistent with sarcoid, but that Plaintiff was largely asymptomatic. *Id.*

Plaintiff followed up with Dr. Twining on September 21, 2010. Tr. at 551. Dr. Twining observed Plaintiff to have 16 of 18 positive trigger points for fibromyalgia and left knee pain with ROM. Tr. at 553. He prescribed folic acid, Methotrexate, Prednisone, Neurontin, and Percocet. Tr. at 555.

On November 23, 2010, Plaintiff presented to Lester Brigman, Jr., FNP ("Mr. Brigman"), for follow up regarding hypertension, diabetes mellitus, and hyperlipidemia. Tr. at 416. She reported chest pain and a productive cough, which she considered to be related to sarcoidosis. *Id.* Mr. Brigman noted Plaintiff's blood sugar to be 333 and stated she had not been watching her diet. *Id.* Plaintiff reported feeling tired or poorly, but stated this problem had not increased in severity. *Id.* Plaintiff had normal ROM in all joints

tested. Tr. at 417. She had no swelling, joint deformities, or abnormal sensation. *Id.* Mr. Brigman discussed with Plaintiff her noncompliance with all medical regimens, and Plaintiff indicated she would try to improve. Tr. at 418.

On November 30, 2010, Dr. Devenyi indicated she had a lengthy discussion with Plaintiff and that she supported Plaintiff's effort to obtain disability benefits. Tr. at 333. Plaintiff complained of multiple health and family stressors. *Id.* She indicated Wellbutrin was not helping her symptoms. *Id.* Dr. Devenyi discontinued Wellbutrin and prescribed Cymbalta. *Id.* She assessed a GAF score of 65. Tr. at 334.

On December 6, 2010, Plaintiff followed up with Dr. Twining. Tr. at 556. Dr. Twining observed Plaintiff to have resolving fullness over her MCP joints, 16 of 18 positive trigger points for fibromyalgia, and left knee pain with ROM. Tr. at 558. He indicated Plaintiff's complaints of pain may be related to sarcoidosis. Tr. at 560. He stated that Plaintiff had been taking Methotrexate incorrectly and that he discussed with her how to properly take the medication. *Id.* He ordered a CT of Plaintiff's hemidiaphragm to assess for abnormalities. *Id.*

Plaintiff visited Dr. Devenyi on December 30, 2010. Tr. at 331. She denied side effects from medications and displayed a bright affect. *Id.* Dr. Devenyi assessed a GAF score of 70. Tr. at 332.

On January 18, 2011, Dr. Devenyi observed Plaintiff to appear calm and pleasant. Tr. at 329. However, she also noted that Plaintiff recently stopped Cymbalta due to a rash and felt anxious, somewhat panicky, and had dysphoric mood. *Id.* Dr. Devenyi changed

Plaintiff's antidepressant from Cymbalta to Paxil and assessed a GAF score of 70. Tr. at 330.

Plaintiff followed up with Dr. Twining on February 7, 2011. Tr. at 561. Dr. Twining observed Plaintiff to have resolving fullness over her MCP joints, 16 of 18 positive trigger points for fibromyalgia, and left knee pain with ROM. Tr. at 563. He again ordered a CT of Plaintiff's left hemidiaphragm, refilled Percocet, discussed replacing Methotrexate with Remicade, and instructed Plaintiff to follow up in two months. Tr. at 565.

Plaintiff followed up with Mr. Brigman regarding her diabetes on February 18, 2011. Tr. at 408. She indicated she was tolerating Januvia well and recorded fasting blood sugar readings that generally ranged from 100 to 150. *Id.* Mr. Brigman noted no abnormalities and instructed Plaintiff to return to the clinic in two months for follow up. Tr. at 409.

Plaintiff followed up with Dr. Devenyi on March 7, 2011. Tr. at 327. Dr. Devenyi observed Plaintiff to be in a good mood and to be better able to deal with problems and anxiety on her current medications. *Id.* She noted that Plaintiff was seeking disability and that she supported her disability claim. *Id.* She assessed a GAF score of 70. Tr. at 328. Dr. Devenyi wrote a note in which she indicated Plaintiff was diagnosed with major depressive disorder, recurrent, severe, without psychosis and posttraumatic stress disorder ("PTSD"). Tr. at 326. She indicated Plaintiff was initially seen in 2005, but that she reestablished treatment on July 29, 2009, and had been seen monthly. *Id.* She listed Plaintiff's medications as Paxil and Vistaril. *Id.*

8

On March 14, 2011, Plaintiff reported to Dr. Hayek that she was doing well from a pulmonary standpoint. Tr. at 459. Dr. Hayek indicated Plaintiff did not have pulmonary symptoms that required systemic therapy for lung disease. Tr. at 460. He encouraged Plaintiff to obtain pulmonary function testing and a chest x-ray and to follow up in four to six weeks. *Id.*

Plaintiff presented to Dr. Twining for follow up on March 24, 2011. Tr. at 380–85. She complained of pain in her chest and low back. Tr. at 380. Dr. Twining noted he was treating Plaintiff for degenerative disc disease, fibromyalgia, and sarcoidosis and managing her pain medications. *Id.* He indicated Plaintiff had been discharged from pain management for failing a drug screen, but that he had not found her to be engaging in any illicit use of her medications. *Id.* Dr. Twining observed Plaintiff to have resolving fullness over the MCP joints of her bilateral hands; bilateral ankle swelling; left knee pain on ROM; and 14 of 18 positive tender points. Tr. at 382. He referred Plaintiff for a CT scan of her hemidiaphragm and for Remicade infusion. Tr. at 384. He increased Plaintiff's dosage of Percocet for pain and indicated he expected Remicade would improve her joint pain and swelling, which was likely related to sarcoidosis. *Id.*

State agency psychological consultant Michael Neboschick, Ph. D. ("Dr. Neboschick"), reviewed Plaintiff's records and completed a psychiatric review technique on April 12, 2011. Tr. at 345–57. He considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders, but found the evidence to show Plaintiff's impairments were not severe. Tr. at 345. Dr. Neboschick found Plaintiff to have no restriction of activities of daily living, mild difficulties in maintaining social functioning,

and mild difficulties in maintaining concentration, persistence, or pace. Tr. at 355. State agency psychologist Olin Hamrick, Jr., Ph. D., reached similar conclusions on August 15, 2011, but found Plaintiff to have mild restriction of activities of daily living. Tr. at 478–91.

Plaintiff followed up with Dr. Hayek on April 14, 2011. Tr. at 456. Dr. Hayek noted that Plaintiff had been noncompliant with appointments. *Id.* Plaintiff complained of recent nasal congestion, productive cough, wheezing, chills, and shortness of breath. *Id.* She continued to report smoking three packs of cigarettes per week. *Id.* Dr. Hayek heard a few bronchial break sounds, but noted no other abnormalities in Plaintiff's lungs. Tr. at 457. He rescheduled Plaintiff's pulmonary function tests and chest x-ray, prescribed Azithromycin and Prednisone for acute bronchitis, referred Plaintiff for a sleep study, recommended weight loss and smoking cessation, and instructed Plaintiff to follow up in three to four weeks. Tr. at 457–58.

Plaintiff presented to Mr. Brigman for primary care follow up on April 18, 2011. Tr. at 359. She stated she was doing well overall, but complained of gas and constipation, as well as increased blood sugar due to use of steroid medications. Tr. at 359. Plaintiff reported arthralgias and indicated she was taking Remicade. *Id.* Mr. Brigman assessed a history of allergic rhinitis, hypertension, constipation, poorly-controlled diabetes mellitus, and sarcoidosis. Tr. at 362. He indicated Plaintiff's A1C had improved by seven points and that her increased blood sugar was likely caused by the steroid she was taking to treat sarcoidosis. *Id.* He encouraged Plaintiff to increase her fiber and water consumption and to continue taking her medications. *Id.*

10

On April 21, 2011, state agency medical consultant Hugh Wilson, M.D. ("Dr. Wilson"), reviewed Plaintiff's records and completed a physical residual functional capacity ("RFC") evaluation in which he found Plaintiff to be limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently climb ramps/stairs, balance, and crawl; occasionally stoop, kneel, and crouch; never climb ladders/ropes/scaffolds; and avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. Tr. at 369–76.

Plaintiff followed up with Dr. Devenyi on May 19, 2011. Tr. at 377. She reported Paxil continued to work okay, but that she was experiencing some dysphoria in response to situational stressors. *Id.* Dr. Devenyi adjusted Plaintiff's medications to help with her symptoms of depression and anxiety. *Id.* She assessed a GAF score of 75. Tr. at 378.

On June 13, 2011, Plaintiff complained to Dr. Twining of swelling in her bilateral feet and instability, pain, and difficulty walking on her left knee. Tr. at 386. She noted overall improvement in her symptoms since starting Remicade. *Id.* Dr. Twining indicated Plaintiff was on an advanced dosage of 180 Percocet tablets per month. *Id.* He observed Plaintiff to have resolving fullness over her MCP joints, pain and crepitus with ROM of her left knee, 14 of 18 positive fibromyalgia trigger points, and bilateral ankle swelling and pain with ROM. Tr. at 388–89. He increased Plaintiff's dosage of Remicade, refilled her other medications, and instructed her to follow up in two months. Tr. at 390–91.

11

Plaintiff presented to Roozchehr Safi, M.D. ("Dr. Safi"), for a follow up regarding lab work on July 18, 2011. Tr. at 399–402. Dr. Safi noted Plaintiff's fasting blood sugars were typically over 200 and that her A1C had increased to 14.1 from 7.3 three months earlier. Tr. at 399. He diagnosed uncontrolled diabetes mellitus and changed Plaintiff's medications to include 15 units of Lantus 100 units/mL at bedtime and a sliding-scale dosage of NovoLog FlexPen 100 units/mL, to be based on Plaintiff's blood sugar readings. Tr. at 402.

On August 1, 2011, Dr. Hayek noted that Plaintiff had "never been compliant and always missed her appointments." Tr. at 453. Plaintiff indicated she was doing okay, but complained of daytime sleepiness and shortness of breath on exertion—particularly when climbing stairs. *Id.* She reported she continued to smoke at least half a pack of cigarettes daily. *Id.* Dr. Hayek indicated the pulmonary function testing performed on April 28 revealed Plaintiff to have normal spirometry, normal diffusion capacity, and normal lung volumes. Tr. at 454. He indicated a chest x-ray performed on the same day showed Plaintiff to have mild hilar fullness with slight interstitial density, but no overt pneumonia or acute changes as compared to the August 2010 x-ray. *Id.* Dr. Hayek prescribed inhaled steroids and encouraged Plaintiff to be compliant with her appointments and to stop smoking. *Id.* He referred Plaintiff for a sleep study for possible sleep apnea. *Id.*

On August 15, 2011, state agency medical consultant Mary Lang, M.D. ("Dr. Lang"), found Plaintiff to be limited as follows: occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk for a total of about six hours in an eight-hour day; sit for a total of about six hours in an eight-hour day;

frequently balance; occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.; and avoid concentrated exposure to hazards. Tr. at 493–99.

Plaintiff followed up with Dr. Devenyi on August 16, 2011, and reported a six to seven month history of auditory hallucinations, recent crying spells, and situational stressors. Tr. at 589. Dr. Devenyi discussed with Plaintiff discontinuing her prescription for Paroxetine and titrating up her dosage of Effexor. *Id.* Dr. Devenyi assessed Plaintiff to have a GAF score of 60. Tr. at 590.

On September 6, 2011, Plaintiff reported to Dr. Devenyi that she was experiencing no side effects from her current medications. Tr. at 586. Dr. Devenyi observed Plaintiff to appear calmer, but noted Plaintiff still endorsed occasional depressive symptoms and fears. *Id.* She assessed Plaintiff to have a GAF score of 65. Tr. at 587.

On October 5, 2011, Dr. Devenyi completed a physician's statement for the South Carolina Department of Social Services ("SCDSS"). Tr. at 500–01. She indicated Plaintiff's disability was permanent and that Plaintiff was unable to work or participate in activities to prepare for work. Tr. at 500. She wrote that Plaintiff's diagnoses included major depressive disorder, recurrent and severe, with psychotic features and PTSD. Tr. at 501.

Plaintiff followed up with Dr. Devenyi on February 6, 2012, and reported her symptoms were controlled by her current medications. Tr. at 583. Dr. Devenyi assessed Plaintiff to have a GAF score of 70. Tr. at 584.

In March 2013, Dr. Twining[3] provided a medical source opinion that included multiple specific limitations as detailed below. Tr. at 580–82.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on April 9, 2013, Plaintiff testified she last worked as a maid in a hotel for approximately a month.  Tr. at 39. She indicated she stopped working because of achiness in her bones and anxiety. *Id.*

Plaintiff endorsed constant pain throughout her body, which was exacerbated by moving and failing to take her medications. Tr. at 40. She indicated she took Percocet and Methotrexate and received Remicade injections. *Id.* She stated she visited Dr. Twining monthly for Remicade injections and every two months for testing. Tr. at 41. She stated the Remicade injections helped her to be able to perform household chores. *Id.* She indicated she developed a rash all over her body after receiving a Remicade injection, but that her doctor told her the rash was related to sarcoidosis. *Id.*

Plaintiff testified she experienced pain in her neck and back, stiffness in her neck, and swelling. Tr. at 47. She indicated she was treated by an orthopedist in the past and had received injections for her pain. *Id.*

Plaintiff testified she could stand for 15 to 20 minutes at a time, but was unable to provide an estimate of how long she could sit. *Id.* She indicated she had difficulty using

---

[3] The signature on this form is illegible, but Plaintiff's attorney informed the ALJ during the hearing that the form was completed by Dr. Twining. *See* Tr. at 37–38.

her left hand due to swelling, sores, and joint pain. Tr. at 42. She testified she took short breaks throughout the day to relieve her pain. Tr. at 45. She indicated she took one or two naps during the day for 30 minutes to an hour at a time. *Id.* She testified she was prescribed a knee brace, but stated it was painful to use because of her rash. Tr. at 46. She indicated she used a cane for support because her left leg sometimes gave out. *Id.* She stated she was unable to bend over for long periods or lift heavy items. Tr. at 48.

Plaintiff testified she visited Waccamaw Mental Health for treatment every two months. Tr. at 42. She stated she experienced two panic attacks per day, which were caused by people sneaking up behind her back. Tr. at 42–43. She indicated her panic attacks lasted for 30 to 45 minutes at a time. Tr. at 43. Plaintiff testified she got along well with others, but did not socialize very often. *Id.* She indicated she was depressed and frequently did not feel like getting up or doing anything. Tr. at 48. She stated she felt worthless and frequently cried. *Id.* She indicated that she continued to be affected by a history of domestic violence. Tr. at 49.

Plaintiff testified she continued to smoke, but had reduced her cigarette use. Tr. at 42. She stated she experienced shortness of breath that was exacerbated by running, not sitting long enough, standing for too long, and lying down the wrong way. Tr. at 44–45.

Plaintiff testified she lived in an apartment with her two sons, ages 15 and 17. Tr. at 39, 43. She stated both of her sons received SSI, one for a behavioral disorder and the other for a learning disorder. Tr. at 39–40. She testified she also had a daughter who visited her daily. Tr. at 43. She stated she was able to care for her personal needs and that her children helped her with household chores. Tr. at 44. She indicated she walked four

blocks to her mother's house each day. *Id.* She stated she visited the meat market each month to purchase meat and the Salvation Army for canned goods. Tr. at 50. She indicated she also purchased some groceries every week. Tr. at 50–51. She stated she no longer attended church. Tr. at 51.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Arthur F. Schmitt, Ph. D., reviewed the record and testified at the hearing.  Tr. at 52–55.  The VE categorized Plaintiff's PRW as a cashier as unskilled and light with a *Dictionary of Occupational Titles* ("*DOT*") number of 211.462-010 and a housekeeper as unskilled and light with a *DOT* number of 323.687-014. Tr. at 53.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work with no balancing or climbing; occasional crawling, kneeling, and crouching; no exposure to temperature extremes, high humidity, pulmonary irritants, unprotected heights, or dangerous machinery; and was limited to simple, repetitive tasks not performed in a fast-paced production environment.  Tr. at 53.  The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW.  *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform.  *Id.*  The VE identified sedentary jobs with an SVP of two as a surveillance system monitor, *DOT* number 379.367-010, with 550 positions in South Carolina and 74,400 positions nationally; a ticket seller, *DOT* number 211.467-030, with 51,500 positions in South Carolina and 3,400,000 positions nationally; and a weight tester, *DOT* number 539.485-010, with 8,800 positions in South Carolina and 430,000 positions nationally. Tr. at 53.

The ALJ next asked the VE to assume that the individual would require unscheduled breaks of unpredictable frequency and duration and asked if there were jobs consistent with that limitation. Tr. at 53–54. The VE testified there would be no jobs in the national economy that would allow for such a limitation. Tr. at 54.

Plaintiff's attorney asked the VE if the jobs identified in response to the first hypothetical question required reaching, handling, or fine finger manipulation. *Id.* The VE testified the weight tester and ticket seller positions did, but the job of surveillance systems monitor did not. *Id.* Plaintiff's attorney then asked the VE to assume the same restrictions in the first hypothetical question, but to further assume the individual was restricted to only occasional reaching, handling, and fine finger manipulation. Tr. at 55. She asked if the individual would be able to perform the jobs identified in response to the first hypothetical question. *Id.* The VE testified the individual could perform the job of surveillance system monitor. *Id.*

Plaintiff's attorney asked the VE to assume the same restrictions, but to further assume the individual would miss more than three days of work per month. Tr. at 56. She asked if the individual could still perform the job of surveillance system monitor. *Id.* The VE testified that such a restriction would eliminate all jobs in the national economy. *Id.*

2.     The ALJ's Findings

In his decision dated June 13, 2013, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant has not engaged in substantial gainful activity since February 17, 2011, the application date (20 CFR 416.971 *et seq.*).

2.   The claimant has the following severe impairments: obesity, fibromyalgia, post-traumatic stress disorder, diabetes mellitus, sarcoidosis, and degenerative disc disease. (20 CFR 416.920(c)).

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a). Specifically, the claimant is able to lift and carry up to 10 pounds occasionally and lesser amounts frequently, sit for 6 hours in an 8-hour day, and stand and walk occasionally except that the claimant can never balance or climb and can occasionally crawl, kneel, and crouch. She can have no exposure to temperature extremes, high humidity, pulmonary irritants, unprotected heights, or dangerous machinery. The claimant is limited to simple, repetitive, routine tasks and cannot work in a fast-paced production environment.

5.   The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.   The claimant was born on November 24, 1974 and was 36 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7.   The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since February 17, 2011, the date the application was filed (20 CFR 416.920(g)).

Tr. at 20–27.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)   the ALJ did not follow the requirements of SSR 96-8p in assessing Plaintiff's RFC;

2)    the ALJ did not adequately consider and weigh the medical opinions of record; and

3)    the ALJ failed to properly evaluate Plaintiff's credibility.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such

---

[4]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to

impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward

---

assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402

U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

1.      RFC Assessment

Plaintiff argues the ALJ did not adequately explain his RFC findings in accordance with the provisions of SSR 96-8p. [ECF No. 12 at 19]. She contends the ALJ failed to discuss multiple relevant records that presented a clinical picture that conflicted with the RFC he assessed. *Id.* at 20–22.

The Commissioner argues that substantial evidence supports the ALJ's RFC finding. [ECF No. 14 at 11]. She maintains the ALJ adequately explained the reasons for the limitations he imposed. *Id.* at 12.

To assess a claimant's RFC, the ALJ must identify the limitations imposed by the claimant's impairments and assess her work-related abilities on a function-by-function basis. SSR 96-8p. This ordinarily requires an assessment of the claimant's ability to sustain work-related activities over an eight hour day and five-day work week or an equivalent work schedule. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and

must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also explain how any material inconsistencies or ambiguities in the record were considered and resolved. *Id.* Relevant evidence includes medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to the medically-determinable impairment, evidence from attempts to work, need for structured living environment, and work evaluations, if available. *Id.* The Fourth Circuit recently held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ found Plaintiff had the RFC to perform sedentary work that required lifting up to 10 pounds occasionally and lesser weight frequently; sitting for six hours in an eight-hour workday; standing and walking occasionally; never balancing or climbing; occasionally crawling, kneeling, and crouching; avoiding exposure to temperature extremes, high humidity, pulmonary irritants, unprotected heights, and dangerous machinery; was limited to simple, repetitive, routine tasks; and could not work in a fast-paced production environment. Tr. at 22. He later indicated "[w]hile the clamant has received medical treatment since her alleged onset date, the medical evidence of record does not reflect any objective abnormalities to suggest that she is incapable of performing

the above residual functional capacity assessment." Tr. at 24. The ALJ indicated he had taken Plaintiff's PTSD and depression "into consideration in limiting her to simple, repetitive, routine tasks and low-stress work but finds no evidence of social issues indicating that the claimant cannot regularly interact with co-workers, supervisors, and the general public." *Id.* He referenced Mr. Brigman's April 2011 treatment note that showed Plaintiff to have normal activities of daily living and a normal musculoskeletal examination. *Id.* The ALJ pointed to normal pulmonary function tests and Plaintiff's noncompliance with recommended treatment and smoking cessation to find that Plaintiff's sarcoidosis was not as disabling as she alleged. *Id.* He acknowledged Plaintiff's diagnosis of fibromyalgia, but cited mild abnormalities on x-ray imaging and normal musculoskeletal and neurological examinations. Tr. at 25. He found that Plaintiff's diabetes was controlled by medications when Plaintiff was compliant with treatment. *Id.* The ALJ considered the opinions of Drs. Twining and Devenyi, and explained his reasons for not accepting them. Tr. at 25. He wrote that he limited Plaintiff's exposure to temperature extremes, high humidity, and pulmonary irritants due to her sarcoidosis. Tr. at 26. He indicated he limited Plaintiff's crawling, climbing, crouching, and exposure to unprotected heights and dangerous machinery because of her back pain and fibromyalgia. *Id.* Finally, he limited Plaintiff to a work environment that did not involve fast-paced production due to her mental health complaints. *Id.*

a.    Mental RFC Assessment

Plaintiff specifically argues the ALJ placed undue emphasis on her high GAF scores and neglected to consider the longitudinal mental health record in assessing the RFC. [ECF No. 12 at 20].

A GAF score may reflect the severity of a claimant's functioning or his impairment in functioning at the time the GAF score is assessed, but it is not meaningful without additional context. *See Parker v. Astrue*, 664 F. Supp. 2d 544, 557 (D.S.C. 2009) (stating that "Plaintiff's GAF score is only a snapshot in time, and not indicative of Plaintiff's long term level of functioning."). In *Parker*, the court cited to the *DSM-IV-TR*'s description of several ranges of GAF scores, as follows:

> A GAF score of 51–61 indicates moderate symptoms (e.g., circumstantial speech and occasional panic attacks) or moderate difficulty in social or occupational functioning (e.g., no friends, unable to keep a job). A GAF score of 61-70 is less severe and indicates only that a person has "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally function[s] pretty well, [and] has some meaningful interpersonal relationships."

664 F. Supp. 2d at 549 n.3, citing *DSM-IV-TR*.

The undersigned recommends the court find the ALJ's assessment of Plaintiff's mental RFC to be supported by substantial evidence. The ALJ referenced Plaintiff's "generally high GAF scores" to support his decision. Plaintiff's GAF scores ranged from a low of 60 to a high of 75 over the nearly two-year treatment history reflected in the record and were generally consistent with mild symptoms and difficulties. *See* Tr. at 328 (GAF score of 70 on March 7, 2011), 330 (GAF score of 70 on January 18, 2011), 332

(GAF score of 70 on December 30, 2010), 334 (GAF score of 65 on November 30, 2010), 337 (GAF score of 65 on September 7, 2010), 339 (GAF score of 65 on July 6, 2010), 341 (GAF score of 65 on May 20, 2010), 378 (GAF score of 75 on May 19, 2011), 584 (GAF score of 70 on February 6, 2012), 587 (GAF score of 65 on September 6, 2011), 590 (GAF score of 60 on August 16, 2011); *see also Parker*, 664 F. Supp. 2d at 549 n.3; *DSM-IV-TR*.

The ALJ did not rely exclusively on Plaintiff's GAF scores to determine her mental RFC, but also looked to her longitudinal mental health treatment record. He referred to Plaintiff's activities of daily living and social interaction and her indications to Dr. Devenyi during the relevant period that she was doing well and experiencing no significant symptoms. *See* Tr. at 24, 26. Because Plaintiff's claim was for SSI, the relevant period began on February 17, 2011, and the ALJ adequately considered Plaintiff's symptoms during the relevant period in assessing her RFC. *See* Tr. at 79, 151. Plaintiff saw Dr. Devenyi on five occasions between March 2011 and February 2012. Tr. at 327–28, 377–78, 583–84, 586–87, 589–90. Although the ALJ specifically referenced two of the five relevant treatment notes, his general conclusions were supported by Plaintiff's mental health records during the period. The ALJ cited the first and last records of the period. *See* Tr. at 24 (the March 2011 treatment record, in which Plaintiff reported no depressive symptoms, and the February 2012[6] treatment record in which

---

[6] The ALJ's decision erroneously states "August 2011," but the referenced observations actually appear in the February 6, 2012, treatment note. *Compare* Tr. at 24, *with* Tr. at 583. This appears to be a typo and is harmless error because the ALJ cited the proper findings to support his conclusion. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir.

Plaintiff reported doing well on her medication regimen, denied auditory hallucinations, appeared calmer, and had good control over her moods). While Plaintiff reported more acute symptoms on one visit, including auditory hallucinations and crying spells and had a lower GAF score, Dr. Devenyi changed her medication, and 21 days later, Plaintiff's condition had improved significantly. *Compare* Tr. at 589–90, *with* Tr. at 586–87.

Finally, the ALJ did not find Plaintiff to have no limitations as a result of her mental impairments, but found her to be significantly restricted to simple, repetitive, routine tasks outside of a fast-paced production environment. *See* Tr. at 26. Thus, the ALJ accounted for the symptoms reflected in the longitudinal treatment history, but concluded they were not so severe as to preclude all work activity. *See id.* Even if the court were to accept Plaintiff's argument that the ALJ should have looked to the mental health treatment records outside the relevant period, the restricted range of mental demands assessed by the ALJ appears to be supported by substantial evidence for the entire period.

b.      Physical RFC Assessment

Plaintiff also argues the ALJ did not resolve conflicts in the evidence in assessing the physical component of Plaintiff's RFC. [ECF No. 12 at 20–21]. Plaintiff specifically references imaging reports of her lumbar spine from 2008 and 2009 that she argues support an inability to meet the physical demands of any work activity. *Id.* at 21. She also

---

1994) (affirming denial of Social Security benefits where the ALJ erred in pain evaluation because "he would have reached the same result notwithstanding his initial error"); *see also Plowden v. Colvin*, C/A No. 1:12-2588, 2014 WL 37217, at *4 (D.S.C. Jan. 6, 2014) (noting that the Fourth Circuit has applied the harmless error analysis in the context of Social Security disability determinations).

maintains the ALJ did not adequately consider the effects of her fibromyalgia diagnosis in assessing her RFC. *Id.* at 21–22.

The undersigned recommends the court find the ALJ adequately reconciled the evidence in assessing the physical aspect of Plaintiff's RFC. The ALJ found degenerative disc disease and fibromyalgia to be among Plaintiff's severe impairments. *See* Tr. at 20. He considered Listing 1.04, but stated "a disorder of the spine must result in compromise of a nerve root or the spinal cord with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication" and found "MRI examinations failed to reveal any significant herniations, stenosis, or nerve root impingement." Tr. at 21. The ALJ's conclusion was supported by the July 2008 and October 2009 MRI reports,[7] which revealed no nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis, which are required to meet Listing 1.04. *See id.*; *see also* 20 C.F.R., Pt. 404, Subpt. P, App'x. 1, §1.04. The ALJ considered and imposed limitations based on the effects of both fibromyalgia and degenerative disc disease as part of the RFC determination. *See* Tr. at 22 (generally limiting Plaintiff to sedentary work that required lifting up to 10 pounds occasionally and less than 10 pounds frequently,

---

[7] X-rays performed on July 15, 2008, showed normal alignment with facet joint osteoarthritis in Plaintiff's lumbar spine; no compression, but spurring at T10-11 in Plaintiff's thoracic spine; normal sacroiliac joints; and osteophytosis and possible compression of Plaintiff's cervical spine at C5. Tr. at 531. Plaintiff was referred for an MRI of her cervical spine on July 28, 2008, which indicated normal vertebral bodies, normal alignment, a C4-5 disc bulge without compression, and a C5-6 disc bulge with mild inferior exiting foraminal stenosis and minimal canal stenosis. *Id.* On October 29, 2009, Plaintiff underwent MRI of her lumbar spine, that revealed a diffuse disc bulge, facet hypertrophy, mild to moderate foraminal narrowing, and no definite impingement at L4-5, as well as an L5-S1 diffuse disc bulge with facet hypertrophy and no definite impingement. *Id.*

sitting for six hours in an eight-hour workday, and standing and walking occasionally), 26 ("due to the claimant's back pain and fibromyalgia, the undersigned has limited the claimant's crawling, climbing, crouching, and exposure to unprotected heights and dangerous machinery"). The ALJ did not find that fibromyalgia or degenerative disc disease rendered Plaintiff incapable of engaging in all work as she alleged, but he cited relevant evidence to support his conclusion. *See* Tr. at 25 ("The claimant has presented with positive tender points and received a diagnosis of fibromyalgia. (Exhibit C14F). However, musculoskeletal and neurological examinations have generally been within normal limits. Images taken of the claimant's lumbar spine in October 2009 showed mild to moderate foraminal narrowing with no definite impingement at L4-5. As mentioned above, she has normal musculoskeletal examinations with no diminished range of motion noted. (Exhibit C10F)."). Therefore, the undersigned's review of the record yields no unresolved conflicts in the record regarding Plaintiff's physical functional abilities.

c.     RFC Generally

The undersigned recommends the court find the ALJ adequately considered and analyzed the relevant evidence and supported the RFC he assessed. The ALJ set forth Plaintiff's limitations on a function-by-function basis and explained his reasons for assessing particular limitations and rejecting others. *See* Tr. at 22–26. To support his RFC findings, he cited specific medical evidence, including imaging reports, pulmonary function testing, and providers' observations, and discussed Plaintiff's daily activities and reports of functioning. *See* Tr. at 24–25. The ALJ considered Plaintiff's testimony as it pertained to her limitations and activities of daily living, but concluded that it was not

supported by the record, which showed her to have greater abilities. *See* Tr. at 23–24. He also gave little weight to Plaintiff's treating physicians' opinions because neither Dr. Devenyi's opinion, nor Dr. Twining's opinion was supported by their treatment records or consistent with the evidence as a whole. *See* Tr. at 24–25.

2.    Evaluation of Medical Opinions

Plaintiff argues the ALJ did not consider the medical opinions of record in accordance with the provisions of 20 C.F.R. § 416.927(c), SSR 96-2p, and SSR 96-5p. [ECF No. 12 at 22]. The Commissioner argues the ALJ adequately considered the opinions of Dr. Twining and Dr. Devenyi, but concluded that they were unsupported by the record. [ECF No. 14 at 12].

ALJs "must always carefully consider medical source opinions about any issue." SSR 96-5p. The opinion of a treating physician is presumed to carry controlling weight as long as it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 416.927(c)(2). However, if a treating physician's opinion is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record, all of the medical opinions of record should be weighed based on the factors set forth in 20 C.F.R. § 416.927(c). *Id.*; SSR 96-2p. The relevant factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the

supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 416.927(c).

ALJs are guided in weighing the medical opinions of record by the provisions of 20 C.F.R. § 416.927. A treating source's opinion generally carries more weight than any other opinion evidence in the record, even if the record does not support giving it controlling weight. 20 C.F.R. § 416.927(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). ALJs should give more weight to medical opinions that are adequately explained by the medical providers and supported by medical signs and laboratory findings than to unsupported and unexplained opinions. 20 C.F.R. § 416.927(c)(3). "The medical source opinion regulations indicate that the more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004).[8] In addition, ALJs are directed to give greater weight to opinions from specialists that address medical issues related to their areas of specialty than to opinions from physicians regarding conditions outside their areas of specialty. 20 C.F.R. §

---

[8] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

416.927(c)(5). ALJs should also consider any additional factors that tend to support or contradict medical opinions in the record. 20 C.F.R. § 416.927(c)(6).

This court previously held that "an express discussion of each factor is not required as long as the ALJ demonstrates that he applied the . . . factors and provides good reasons for his decision." *Hendrix v. Astrue*, C/A No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). It is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

a.    Dr. Twining's Opinion

On March 8, 2013, Dr. Twining completed a medical opinion form in which he indicated Plaintiff had the following restrictions: occasionally lift and/or carry 10 pounds; frequently lift and/or carry 10 pounds; stand and walk less than two hours during an eight-hour workday; sit less than two hours during an eight-hour workday; sit for five to ten minutes at a time; stand for zero to five minutes at a time; walk around every five to ten minutes; walk around for five to ten minutes each time; needs opportunity to shift at will from sitting or standing/walking; will need to lie down at unpredictable intervals two to three times during a work shift; occasionally twist and stoop (bend); never crouch, climb stairs, or climb ladders; limited reaching, handling, and fingering; limited pushing/pulling; avoid even moderate exposure to extreme cold, extreme heat, fumes,

odors, dusts, gases, and poor ventilation; avoid all exposure to hazards; and anticipated to be absent from work more than three times per month. Tr. at 580–82. He wrote that Plaintiff had active sarcoidosis and inflammatory arthritis and experienced pain and swelling. Tr. at 581.

Plaintiff argues the ALJ did not adequately consider Dr. Twining's opinion and treatment notes. [ECF No. 12 at 25–29.] She specifically maintains the ALJ discounted the opinion based on his erroneous finding that Plaintiff did not have inflammatory arthritis. *Id.* at 26. She contends the ALJ should have considered Dr. Twining's opinion regarding the limiting effects of Plaintiff's fibromyalgia diagnosis based on the criteria set forth in SSR 14-1p for chronic fatigue syndrome ("CFS"). *Id.* at 27. She further argues Dr. Twining's opinion regarding the functional effects of Plaintiff's fibromyalgia syndrome was supported by medically-acceptable clinical and laboratory diagnostic techniques and was not inconsistent with the findings of any other treating or examining physician. *Id.* at 28–29.

The Commissioner argues the ALJ properly found that Dr. Twining's reports demonstrated Plaintiff had severe fibromyalgia, but did not support a finding that Plaintiff had disabling functional limitations. [ECF No. 14 at 14–17].

The ALJ gave little weight to Dr. Twining's opinion and wrote the following: "While this medical source statement indicates that the claimant has limitations due to active sarcoidosis and inflammatory arthritis, the claimant has actually been treated for fibromyalgia and not arthritis, and her sarcoidosis has been non-symptomatic and untreated since her diagnosis." Tr. at 25. He further provided "[g]enerally, the claimant

33

has minimal and mild treatment notes that do not support the stringent limitations set forth herein." *Id.* Earlier in the decision, the ALJ noted that "[w]hile the claimant's rheumatologist limited the claimant to less than sedentary work, he appears to have based this opinion on the claimant's sarcoidosis diagnosis, and treatment notes indicate that the claimant currently has no active symptoms." Tr. at 24–25. He acknowledged Plaintiff's positive fibromyalgia tender points, but pointed out that musculoskeletal and neurological examinations were generally within normal limits and that imaging studies showed no acute abnormalities. Tr. at 25. The ALJ also noted that Dr. Twining "continues to prescribe narcotic pain medication to the claimant when other physicians will not, based on what is, essentially, a diagnosis of fibromyalgia, questionably symptomatic sarcoidosis and mild degenerative disc disease." *Id.*

The ALJ acknowledged that Dr. Twining was Plaintiff's treating rheumatologist, which indicated that he weighed both Dr. Twining's status as a treating physician and a specialist under the factors set forth in 20 C.F.R. § 416.927(c), but he provided adequate reasons for concluding that Dr. Twining's opinion was not entitled to controlling weight. *See* Tr. at 24–25 (citing evidence that Plaintiff's sarcoidosis was non-symptomatic and normal objective test results and examination findings).

The ALJ considered the supportability of Dr. Twining's opinion with his own records, but concluded that Dr. Twining's observations did not support the limitations he found. *See* Tr. at 25. He cited Dr. Twining's assessment of positive fibromyalgia trigger points, but also pointed to his other findings that were generally benign. *See id.*; *see also* Tr. at 382, 388 (14 of 18 positive trigger points, complaints of painful left knee ROM,

34

and some bilateral ankle swelling, but otherwise normal physical exam), 563 (16 of 18 positive trigger points and pain with ROM of left knee, but otherwise normal physical exam). Although the ALJ specified that he accorded little weight to Dr. Twining's opinion, he set forth specific limitations based on degenerative disc disease and fibromyalgia and, in fact, adopted several of the restrictions specified by Dr. Twining as part of the RFC assessment, which demonstrates his consideration of Dr. Twining's treatment record. *See* Tr. at 26 (imposing limitations based on back pain and fibromyalgia); *compare* Tr. at 22 (lift and carry up to 10 pounds occasionally and lesser amounts frequently, stand and walk occasionally), *with* Tr. at 580 (occasionally lift and carry 10 pounds, frequently lift and carry 10 pounds, stand and walk less than two hours).

The ALJ relied heavily on inconsistencies between Dr. Twining's opinion and the record as a whole. He found that Dr. Twining's suggestion that Plaintiff had disabling sarcoidosis was not supported by the record, which showed her sarcoidosis to generally be asymptomatic. *See* Tr. at 24–25 (normal pulmonary function testing in July 2010; Plaintiff's March 2011 report that she was doing well from a pulmonary standpoint, continued to smoke, and experienced no shortness of breath; and Plaintiff's noncompliance with recommended follow up and suggested treatment). The ALJ recognized that Dr. Twining prescribed Plaintiff's pain medications, but he indicated this was contraindicated by a record that showed diagnoses of "fibromyalgia, questionably symptomatic sarcoidosis and mild degenerative disc disease," as well as Plaintiff's history of discharge from pain management and other providers' refusal to prescribe pain medications. *See* Tr. at 25; *see also* Tr. at 380 (indicating Plaintiff was discharged from

35

pain management for taking a friend's medications), 510 ("no signs of distress while she was here and on several occasions was obviously embellishing her symptoms or completely fabrication [sic] in order to try and obtain some narcotics"), 526 (pharmacy notified physician in emergency department that Plaintiff had recently received 158 Percocet and that they were suspicious of drug-seeking behavior).

Although Plaintiff argues the ALJ erred in rejecting Dr. Twining's assertion that he treated Plaintiff for inflammatory arthritis, the treatment records during the relevant period specifically indicate Dr. Twining treated Plaintiff for fibromyalgia, degenerative disc disease, and sarcoidosis. *See* Tr. at 380, 386, 561. Plaintiff argues that Dr. Twining prescribed Methotrexate and Remicade for inflammatory arthritis. [ECF No. 12 at 26], citing Tr. at 459 (Dr. Hayek notes "[s]he started seeing Dr. Twining because of her arthritis, and she was started on methotrexate."). However, Dr. Twining specified that he prescribed Methotexate and Remicade for sarcoidosis. *See* Tr. at 380, 561 ("pt is now on mtx for scarcoid [sic], was taking incorrectly in past, but now have this straightened out, now on 6 per week, with plan to add remicade this year"). In light of this evidence, the undersigned concludes that the ALJ did not err in basing his decision to accord little weight, in part, on the fact that the record does not support Dr. Twining's March 2013 assertion that he treated Plaintiff for inflammatory arthritis.

The undersigned recommends the court find SSR 14-1p inapplicable because it pertains to cases involving CFS and the record does not suggest Plaintiff has such a diagnosis. Although SSR 14-1p references fibromyalgia as a condition that sometimes co-occurs with CFS, no treating, examining, or evaluating physician suggested Plaintiff

had CFS. Furthermore, the footnote referenced by Plaintiff that indicates a "considerable overlap of symptoms between CFS" and fibromyalgia, specifies that fibromyalgia is a medically-determinable impairment when characterized by tender points. SSR 14-1p n. 21. The Social Security Administration's ("SSA's") rulings provide that fibromyalgia cases are to be evaluated based on the criteria in SSR 12-2p, and SSR 14-1p does not suggest that it is intended to abrogate SSR 12-2p.

Nevertheless, it does not appear that SSR 14-1p creates any more onerous burden on ALJs to consider the opinions of treating physicians. The undersigned does not extract from SSR 14-1p any more exacting standard in weighing medical opinions than that found in 20 C.F.R. § 416.927, and the undersigned has recommended a finding that the ALJ adequately weighed Dr. Twining's opinion based upon those criteria. Pursuant to both 20 C.F.R. § 404.927(c)(2) and SSR 14-1p, the ALJ is to consider the nature of the treatment relationship between the claimant and the medical source. If the "treating source's medical opinion regarding the nature and severity of a person's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and the opinion is not inconsistent with the other substantial evidence in the case record," it is given controlling weight. 20 C.F.R. § 404.927(c)(2); SSR 14-1p. Plaintiff again points to her positive trigger points as an acceptable technique cited by the SSA in SSR 14-1p [ECF No. 12 at 28], but the ALJ did not dispute Dr. Twining's finding of positive trigger points or his diagnosis of fibromyalgia. The ALJ merely found that Dr. Twining's opinion was inconsistent with the other substantial evidence in the case record, which is a

valid reason for giving less weight to a treating physician's opinion. *See* Tr. at 24–25; see also *Stanley v. Barnhart*, 116 F. App'x at 429; 20 C.F.R. § 416.927(c).

In light of the foregoing, the undersigned recommends a finding that the ALJ adequately weighed the relevant factors and cited substantial evidence to support his decision to accord little weight to Dr. Twining's opinion.

b.    Dr. Devenyi's Opinion

On November 30, 2010, and March 7, 2011, Dr. Devenyi indicated in treatment notes that she supported Plaintiff's claim for disability. Tr. at 327, 333. On October 5, 2011, she indicated on a SCDSS form that Plaintiff was permanently disabled and unable to work or participate in activities to prepare for work. Tr. at 500. She listed Plaintiff's diagnoses to be major depressive disorder and PTSD. Tr. at 501.

Plaintiff argues the ALJ did not properly weigh Dr. Devenyi's opinion. [ECF No. 12 at 29–31]. The Commissioner maintains neither Dr. Devenyi's progress notes, nor the record as a whole supports Dr. Devenyi's opinion and that Dr. Devenyi cited no evidence to support or explain her opinion. [ECF No. 14 at 13].

The ALJ accorded little weight to Dr. Devenyi's opinion. Tr. at 25. Earlier in the decision, she explained that Dr. Devenyi's opinion was unsupported by her treatment notes, the remaining medical evidence of record, and Plaintiff's daily activities and social functioning. *See* Tr. at 24, 25. The ALJ further stated the following regarding Dr. Devenyi's opinion: "This check-off form merely states that, due to the claimant's major depressive disorder and post-traumatic stress disorder, she is permanently disabled and is

38

unable to work. This form is unsupported by Dr. Devenyi's own notes and by the remaining medical evidence of record." Tr. at 25.

The undersigned recommends the court find the ALJ adequately considered and weighed Dr. Devenyi's opinion and cited substantial evidence to support his decision to accord it little weight. The ALJ did not accord controlling weight to Dr. Devenyi's opinion because he found that it was inconsistent with the other substantial evidence of record and, thus, relied upon "persuasive contrary evidence" to support his decision. *See* Tr. at 24–25; s*ee also Mastro*, 270 F.3d at 178. The record reflects that the ALJ considered the examining, treatment, and specialization factors in 20 C.F.R. § 416.927(c), in assessing Dr. Devenyi's opinion. *See* Tr. at 24 (recognizing Dr. Devenyi as a "treating physician" and referencing mental health treatment notes and specific dates of service). However, the ALJ concluded that the factors that weighed in favor of accepting Dr. Devenyi's opinion were outweighed by the supportability and consistency factors. *See id.* The ALJ found Dr. Devenyi's opinion to be unsupported by the GAF scores she assessed and the observations she included in her treatment notes. *See id.* He also found Dr. Devenyi's opinion to be inconsistent with the record as whole, which showed Plaintiff to be socially active and capable of engaging in activities of daily living. *See id.* He cited Dr. Devenyi's failure to explain the reasons for her opinion as another factor that he considered. *See* Tr. at 25 ("This check-off form merely states that, due to the claimant's major depressive disorder and post-traumatic stress disorder, she is permanently disabled and is unable to work."). *See* 20 C.F.R. § 416.927(c)(3).

39

Plaintiff argues the ALJ erred in assessing only Dr. Devenyi's October 2011 statement and in neglecting Dr. Devenyi's November 2010 and March 2011 treatment notes that indicated she supported Plaintiff's disability claim. [ECF No. 12 at 30]. However, Plaintiff alleges no harm as a result of such failure. The October 2011 statement that the ALJ specifically referenced was the most detailed of the three, but all were general indications that Plaintiff was disabled and failed to include specific limitations or an explanation. While the ALJ did not specifically cite Dr. Devenyi's November 2010 and March 2011 opinions, it logically follows that he rejected them for the same reasons he rejected her October 2011 medical source statement. Therefore, any error on the part of the ALJ in failing to specifically reference these statements was harmless. *See Mickles*, 29 F.3d at 921; *Plowden*, 2014 WL 37217, at *4.

### 3.     Credibility

Plaintiff argues the ALJ made ambiguous findings regarding her credibility and failed to explain his findings. [ECF No. 12 at 30–32]. She maintains the ALJ erroneously discounted her credibility based on a lack of objective evidence and failed to consider her daily activities or the methods she used to relieve her pain. *Id.* at 34–35.

The Commissioner argues the ALJ considered all the evidence of record in determining Plaintiff's RFC. [ECF No. 14 at 17]. She maintains the ALJ did not assess Plaintiff's credibility solely on the basis of a lack of objective evidence to support her complaints, but also relied upon her non-compliance with her doctor's instruction to stop smoking, her dismissal from pain management for taking non-prescribed opiate pain medications, and her daily activities. *Id.* at 20.

A finding of disability cannot be based on allegations of pain or other symptoms without medical signs and laboratory findings demonstrating the existence of a medically-determinable impairment that would cause such pain and symptoms. SSR 96-7p. An ALJ should only consider the intensity, persistence, and functionally-limiting effects of symptoms after the claimant has established the existence of a medically-determinable impairment. *Id.* Once a claimant has established the existence of a condition reasonably likely to cause the alleged symptoms, he may "rely exclusively on subjective evidence to prove the second part of the test." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). "[T]he adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record" in determining whether the claimant's statements are credible. SSR 96-7p. To assess the credibility of the claimant's statements, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* The ALJ cannot disregard the claimant's statements about symptoms merely because they are not substantiated by objective medical evidence. *Id.*

If an ALJ rejects a claimant's testimony about his pain or physical condition, he must explain his reasons for doing so and his decision must be supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on

credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit his ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3).

The ALJ found that the claimant's medically-determinable impairments could reasonably be expected to cause some of her alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. Tr. at 24. He indicated Plaintiff's testimony "appeared overstated." *Id.* He found that the medical evidence did not reflect any objective abnormalities that suggested an inability to perform the assessed RFC. *Id.* He found that Plaintiff's mental health treatment notes and her reported activities of daily living and social functioning were inconsistent with the degree of mental limitation she alleged. *Id.* He cited Plaintiff's

reports to her physicians that she was doing well, her noncompliance with recommended treatment and follow up, and her failure to stop smoking. *Id.* The ALJ recognized that Dr. Twining prescribed Plaintiff narcotic pain medication, but also cited Plaintiff's history of discharge from pain management and the relatively mild and asymptomatic nature of her sarcoidosis and degenerative disc disease. Tr. at 25. Finally, he indicated "due to the aforementioned inconsistencies, particularly the relatively benign physical and mental examinations and the extent of the claimant's daily activities, the undersigned cannot find the claimant's allegation that she is incapable of all work activity to be credible." Tr. at 26.

Plaintiff argues the ALJ's statements regarding her credibility are ambiguous and, thus, are not sufficiently specific to make clear the weight the adjudicator gave Plaintiff's statements and the reasons for that weight. [ECF No. 12 at 31]. In *Woodby v. Colvin*, C/A No. 1:14-952-RMG-SVH, 2015 WL 628482, at *16 (D.S.C. Feb. 12, 2015), the court found that the ALJ's credibility assessment was improper due to its ambiguity where the ALJ did not clearly indicate whether he found the plaintiff had a medically-determinable impairment that could cause the alleged pain and symptoms and did not cite substantial evidence to support a finding that the plaintiff was not credible. Although the ALJ included in the decision language similar to that used by the ALJ in *Woodby*, the undersigned recommends the court find that it was not ambiguous when read in the context of the decision as a whole. *Compare* Tr. at 24 ("the claimant's medically determinable impairments could reasonably be expected to cause *some* of her alleged symptoms"), *with Woodby*, 2015 WL 628482, at *16 ("the claimant's medically

determinable impairments could reasonably be expected to cause *some level* of the alleged symptoms"). By stating that Plaintiff's testimony "appeared overstated" and through his subsequent discussion of the evidence, the ALJ indicated he accepted that Plaintiff had medically-determinable impairments that could reasonably cause the alleged symptoms, but that he did not find the record to support all of the limitations Plaintiff alleged in her testimony. *See* Tr. at 24–26. The ALJ also discussed the particular limitations he found Plaintiff's impairments to impose. *See* Tr. at 26.

Plaintiff argues the ALJ did not examine how her pain affected the routine of life and erroneously relied upon a lack of objective evidence to discount her credibility. [ECF No. 12 at 34–35], citing *Mickles*, 29 F.3d at 925. The record does not support this argument. The ALJ considered Plaintiff's testimony and the medical evidence of record in accordance with 20 C.F.R. § 416.929(c)(3). He cited a lack of objective evidence to support Plaintiff's allegations, but also relied upon Plaintiff's reports to her physicians regarding her pain and daily activities. *See* Tr. at 24 (reported no depressive symptoms; reported doing very well on medications; smiled easily and was in a good mood; normal thought content, judgment, insight, and cognition; sexually active and socially active enough to attend parties; stated she was doing well from a pulmonary standpoint and still smoking). He also considered other non-objective factors that he found to reflect poorly on Plaintiff's credibility, including her continued smoking, her noncompliance with recommended treatment, and the fact that she was discharged from pain management after testing positive for non-prescribed opiate painkillers. Tr. at 24–25.

44

In light of the foregoing, the undersigned recommends the court find the ALJ's credibility determination to be supported by substantial evidence.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

September 21, 2015                            Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).